UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                        )
In re JONES SODA COMPANY                ) No. C07-1366RSL
SECURITIES LITIGATION                   )
                                        ) ORDER GRANTING DEFENDANTS'
                                        ) MOTION TO DISMISS
                                        )
                                        )
_____)

This matter comes before the Court on "Defendants' Motion to Dismiss First Amended Consolidated Class Action Complaint" pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). Defendants argue that plaintiffs' allegations of falsity, scienter, and loss causation do not satisfy the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5.

**THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs filed this litigation on behalf of all persons who purchased the publicly traded stock of Jones Soda Company between January 10, 2007, and May 1, 2008.[1] Jones Soda is a manufacturer of premium sodas, bringing to market "quirky" flavors made with pure sugar cane and packaged using consumer-generated labels. First Amended Consolidated Complaint

---

[1] Plaintiffs indicate that they intend to shorten the class period to January 10, 2007 - March 10, 2008. Because no motion to amend the complaint has been filed or granted, this Order evaluates the adequacy of the First Amended Consolidated Class Action Complaint.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS

("FACC") ¶ 4. Plaintiffs allege that Jones Soda and its former Chief Executive Officer ("CEO"), Peter van Stolk misled the investing public by overstating their efforts and accomplishments as Jones Soda entered the carbonated soft drink market. The theory of the complaint is that defendants repeatedly misstated Jones Soda's penetration of the market, leading to an overvaluation of Jones Soda stock based on the false impression that sales would soon increase significantly. Meanwhile, the principals, including defendant van Stolk, knew the true state of affairs and sold their personal stock so that they could profit before the truth was revealed.[2]

In the First Amended Consolidated Class Action Complaint, plaintiffs specifically allege that defendants mislead the public in the following ways:

(1) Defendants falsely represented that Jones Soda "had secured by January 10, 2007 25% ACV (all commodity volume) penetration" (FACC ¶ 5(a));

(2) Defendants falsely represented that Jones Soda was "taking the necessary steps to penetrate the $66 billion carbonated soft drink ("CSD") market by hiring additional personnel, making upgrades to infrastructure, and increasing sales and marketing expenditures" (FACC ¶ 5(b));

(3) Defendants falsely represented that, as of March 8, 2007, shelf space at major retailers across the country "was in the process of being set and would be completed by Memorial Day" (FACC ¶ 47);

(4) Defendants falsely represented that Jones Soda had "achieved ACV (or outlet availability) of 21% by Memorial Day" (FACC ¶ 76);

(5) Defendants falsely represented that, although it had missed its Memorial Day goal, it had reached its 25% targeted penetration in July 2007 (FACC ¶¶ 80-81);

(6) Defendants falsely represented that by the end of August 2007, Jones Soda products were in 15,700 stores throughout the United States, representing more than 25%

---

[2] In response to defendants' motion to dismiss, plaintiffs acknowledge that the stock sales alleged in the complaint are not suspicious. Opposition at 22.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS -2-

ACV (FACC ¶ 82); and

(7) Defendants falsely represented that it had penetrated 25% of the market for canned soda by the end of 2007 (FACC ¶¶ 83-85).

The complaint alleges that defendants made these representations with knowledge that they were false at the time they were made.[3]

## PRIVATE SECURITIES LITIGATION REFORM ACT ("PSLRA")

In 1995, Congress raised the pleading requirements in private securities litigation in order to deter the routine filing of shareholder lawsuits whenever a significant change in a company's stock price occurred. Congress was particularly concerned with litigation based on nothing more than (1) speculation that the company "must have" engaged in foul play and (2) the faint hope that the liberal rules of discovery would turn up some supporting evidence. See Joint Explanatory Statement to the PSLRA, H.R. CONF. REP. NO. 104-369 (1995), *reprinted in* 1995 U.S.C.C.N. 730. In order to state a claim under § 10b of the Exchange Act and Rule 10b-5 plaintiffs "must allege: (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which [plaintiffs] relied (5) which proximately caused their injury." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388 (9th Cir. 2002).

Unlike most civil litigation, allegations sufficient to put defendants on notice of the nature of the claim are insufficient under the PSLRA: private securities plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6),

---

[3] Because plaintiffs have not adequately pled falsity and/or scienter, the Court need not determine whether defendant van Stolk could be liable for the alleged misprepresentations as a "controlling person" under § 20(a) of the Exchange Act.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                -3-

the complaint must, as to each act or omission alleged to violate the securities laws, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus, private securities plaintiffs must "plead with particularity both falsity and scienter." Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001).

There is little consistency within the Circuit Courts regarding the state of mind that is required in private securities litigation and what type of evidence satisfies the PSLRA's "strong inference" requirement. In In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970, 975-77 (9th Cir. 1999), the Ninth Circuit evaluated the requirements of the PSLRA, its legislative history, and the prior practice of the courts and determined that the required state of mind for purposes of § 78u-4(b)(2) is, at a minimum, a "deliberate recklessness" that reflects some degree of knowing misconduct. In order to give rise to a "strong inference" of "deliberate recklessness," securities plaintiffs may no longer rely on evidence which suggests that the corporation and/or its officers had a motive and opportunity to defraud the market: rather, the complaint must allege, with particularity, "facts indicating no less than a degree of recklessness that strongly suggests actual intent." 183 F.3d at 979. Recklessness is defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." DSAM Global Value Fund, 288 F.3d at 389.

The Court recognizes that Silicon Graphics and its progeny make it very difficult for private securities litigants: in order to survive a motion to dismiss, plaintiffs must possess, at the time of filing, evidence that defendants had knowledge of, or were deliberately reckless regarding, the falsity of public statements at the time they were made.[4] Simply alleging that

---

[4] Plaintiffs can no longer file a claim and hope that discovery will provide the necessary proof:

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS            -4-

statements were knowingly false is not enough. Such allegations must be supported with references to the specific facts, documents, and/or reports. In order to determine whether the complaint gives rise to a strong inference of intentional or deliberately reckless conduct, the Court must assess the allegations "holistically," along with plausible nonculpable explanations for defendant's conduct. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2509-10 (2007). Although "[t]he inference that defendant acted with scienter need not be irrefutable . . . [it] must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510. Thus, the PSLRA compels a rigorous analysis of the complaint to determine whether the allegations, taken collectively, give rise to a strong inference that defendant lied or was deliberately reckless.

### APPLICATION OF PSLRA TO PLAINTIFF'S ALLEGATIONS

The complaint contains numerous quotations from defendants dating from November 1, 2006, to May 1, 2008. A close reading of the complaint reveals that only seven of these statements, all of which concerned Jones Soda's efforts to penetrate the carbonated soft drink market, are specifically alleged to be false. FACC ¶¶ 5(a), 5(b), 47, 76, 80, 82, and 85. The allegations regarding each of the seven statements are considered below.

---

> In the absence of greater particularity and more incriminating facts, we have no way of distinguishing [plaintiffs'] allegations from the countless "fishing expeditions" which the PSLRA was designed to deter. See H.R. CONF. REP. 104-369 at 37.

> Congress enacted the PSLRA to put an end to the practice of pleading "fraud by hindsight." See, e.g., Medhekar v. United States Dist. Ct., 99 F.3d 325, 328 (9th Cir. 1996) (holding that Congress intended for complaints under the PSLRA to stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed).

Silicon Graphics, 183 F.3d at 988.

## A. FALSITY AND SCIENTER

### 1. Statements That Jones Soda Had Secured 25% ACV Penetration as of January 10, 2007

Plaintiffs complain that defendants misled investors during a presentation at the 9th Annual ICR Xchange Conference on January 10, 2007. According to industry analysts covering the conference, Jones Soda "announced that it has secured 25% ACV (all commodity volume) penetration, likely to be on shelves by Memorial Day, 2007." FACC ¶ 40. Plaintiffs allege that this statement was false because (a) Jones Soda later admitted that its products were not actually on the shelves in January 2007, and (b) an industry expert has opined that Jones Soda could not have entered into agreements with retailers that secured 25% ACV penetration.

Plaintiffs' first argument is based on an unreasonable interpretation of defendants' statements. Jones Soda did not say that its products were on the shelves of 25% of the retail establishments as of January 10, 2007. Taken as a whole, the statements recounted by the industry analysts[5] clearly convey that the product had not even begun to ship as of that date and that stocking would be complete at some point in the future. Stifel Nicolaus reported that Jones Soda had secured a share of retail outlet availability for the 2007 launch of its canned product, but that shipments would not begin until the end of January. FACC ¶ 41. ThinkEquity Partners informed investors that "[s]ince retailers 'reset' their shelves in phases, Jones will not be on the shelf in all retailers" making up the 25% ACV until Memorial Day. FACC ¶ 42. Similarly, Piper Jaffray announced that Jones Soda "has secured 25% ACV (all commodity volume) penetration, likely to be on the shelves by Memorial Day, 2007." FACC ¶ 40. Every one of the industry analysts covering the ICR Xchange Conference understood (and told the public) that Jones Soda had taken steps to penetrate the carbonated soft drink market and would eventually be stocking its product in 25% of retail outlets. Plaintiffs' construction of the analysts'

---

[5] No direct quotations from van Stolk or Jones Soda are provided in the complaint.

statements – as an announcement that Jones Soda had actually placed its products on the shelves of 25% of retail establishments in January 2007 – is unreasonable.

Plaintiffs also argue that the disputed statements were untrue or misleading when made because Jones Soda had not, in fact, reached agreements with 25% of retailers to stock its canned product. This assertion is based on the opinion of Tom Pirko, a soft drink industry consultant.[6] No evidence regarding the agreements Jones Soda reached, or did not reach, with QFC, Fred Meyers, WinCo., K-Mart, Albertson's, Safeway, Sam's Club, Target, Wal-Mart, etc., is provided. Instead, Mr. Pirko notes that shelf space must be purchased by a soft drink manufacturer and concludes that Jones Soda could not have secured placement for its product in 15,000 retail stores because it "never expended the amounts of money necessary to penetrate 25% of the carbonated soft drink market." Pirko Decl. at 12-13.

Mr. Pirko acknowledges that retailers are sometimes willing to accept smaller payments from "new companies attempting to enter the marketplace" (Pirko Decl. at 13), but does not consider that possibility here. Nor does he offer any evidence regarding how much or how little Jones Soda actually spent on slotting fees and promotional allowances. Although he mentions quarterly and earnings reports that indicate promotional and sales expenditures in the millions of dollars (Pirko Decl. at ¶¶ 25 and 42), Mr. Pirko simply ignores them, apparently on the theory that Jones Soda must have been lying. The sole basis for Mr. Pirko's opinion that defendants' market penetration plan was a farce is a statement made on May 1, 2008:

> Let me wrap-up our comments by saying that, again, we are focused on building a highly profitable business over the next few years. That requires an investment in the infrastructure and we raised $30 million to build that infrastructure and we are now investing that money in people, in better systems to reduce supply chain costs, we're investing in consumer demand for our brands and new product development.

---

[6] The Court has considered the facts presented in Mr. Pirko's declaration, most, if not all, of which were repeated in the complaint. Mr. Pirko's opinions, however, "cannot substitute for facts under the PSLRA." Fin. Acquisition Partners L.P. v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006).

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -7-

Mr. Pirko argues that this statement directly contradicts or is inconsistent with Jones Soda's earlier statements regarding expenditures made to penetrate 25% of the retail stores. Mr. Pirko puts too much emphasis on the word "now," construing it as a negation of all prior expenditures. The fact that Jones Soda was, as of May 1, 2008, investing in people, systems, consumer demand, and product development does not mean that it was not making such investments in January 2007. In addition, expenditures for the development of infrastructure tell us nothing about the timing or size of marketing-related expenditures. Defendants' May 1, 2008, statement regarding the use to which its $30 million was then being put is not necessarily inconsistent with defendants' earlier statement that it had secured 25% ACV penetration: it is far more likely that Jones Soda had been making expenditures since the fall of 2006 and that the May 1, 2008, statement simply identified the focus of the company's current expansion efforts. Taken as a whole, plaintiffs' allegations do not raise a strong inference that the January 2007 statements were intentionally false, misleading, or made with deliberate recklessness.

**2. Statements That Jones Soda Was Taking Necessary Steps to Penetrate the CSD Market**

Plaintiffs allege that Jones Soda represented that it was "taking the necessary steps to penetrate the $66 billion carbonated soft drink ("CSD") market by hiring additional personnel, making upgrades to infrastructure, and increasing sales and marketing expenditures" (FACC ¶ 5(b)) and that the representation was false. The Court has not found any statement attributed to defendants wherein Jones Soda alleges that it is "taking the necessary steps to penetrate the $66 billion carbonated soft drink ("CSD") market." Defendants' actual statements, contained in a quarterly earnings release, read:

> In an effort to maximize our opportunities with our large network of beverage retailers across the country and best prepare for the upcoming launch we are hiring additional personnel, making upgrades to our infrastructure, and increasing our sales and marketing expenditures. We believe these investments will well position us to capitalize on the many prospects we believe exist for this business.

FACC ¶ 37. Following the 9th Annual ICR Xchange conference, ThinkEquity Partners reported that "Jones Soda prepared for the expiration on December 31 of its exclusive licensing agreement with Target (NYSE: TGT, $58.31) by 'hiring additional personnel, making upgrades to our infrastructure, and increasing our sales and marketing expenditures.'" FACC ¶ 42.

Plaintiffs have provided no evidence regarding personnel changes, infrastructure upgrades, or sales and marketing expenditures made by Jones Soda between November 2006 and January 2007. Simply asserting that defendants' statement regarding these matters were false is not sufficient under the PSLRA. Ronconi, 253 F.3d at 431. Plaintiffs therefore rely on the May 1, 2008, statement quoted above, arguing that an admission that Jones Soda was "now" investing in people, systems, and marketing shows that defendants' earlier representations regarding similar activities were false. But the fact that Jones Soda was making expenditures as of May 1, 2008, does not mean that it had not engaged in hiring, upgrades, and investments in November 2006 and January 2007. There is no inconsistency that suggests either that the earlier statements regarding hiring, upgrades, and expenditures were false or that defendants intentionally or with deliberate recklessness made misrepresentations regarding their activities in late 2006 and early 2007.

### 3. Statements That Shelf Space at Major Retailers Was Being Set as of March 8, 2007, and Would Be Complete by Memorial Day

Plaintiffs allege that defendant van Stolk touted Jones Soda's market penetration in a March 8, 2007, conference call by stating that shelf space at fifteen major retailers "was in the process of being set and *would be completed by Memorial Day*." FACC ¶ 47 (emphasis in complaint). This statement was false, plaintiffs allege, because defendants "knew that Jones Soda would not and could not have its soda cans stocked on shelves of 25% of major retail stores by Memorial Day." FACC ¶ 47. Plaintiffs do not challenge van Stolk's assertion that, as of March 8, 2007, Jones Soda products were being shelved at major retailers across the country.

Plaintiffs contend, however, that defendants must have known at the time this statement was made that their Memorial Day prediction was too optimistic because they had not expended the amounts necessary to penetrate 25% of the carbonated soft drink market. The only evidence offered in support of this theory is Mr. Pirko's declaration. For the reasons discussed in Sections 1 and 2, Mr. Pirko's construction of and emphasis on the word "now" is unreasonable and does not give rise to a strong inference of scienter. There being no direct contradiction or inconsistency between defendants' March 8, 2007, statement and their May 1, 2008, disclosure, plaintiffs have failed to show either falsity or scienter as to this statement.[7]

### 4. Statements That Jones Soda had Achieved Certain Percentages of ACV Between Memorial Day and the End of 2007

#### a. Twenty One Percent ACV by Memorial Day

In June 2007, defendants acknowledged that they had not met their goal of having Jones Soda products on the shelves of 25% of retail outlets by Memorial Day:

> [T]he company said that it achieved ACV (or outlet availability) of 21% by Memorial Day, below its initial expectation of 25%. The company blamed the decrement on Kroger, which had not shelved the product as expected. The company said that it expected to achieve 25% by the end of the 2Q, or no later than July 4.

FACC ¶ 76 (quoting Stifel Nicolaus report). At this point in the discussion regarding Jones Soda's plans to penetrate the carbonated soft drink market, the percentage of ACV penetration is no longer presented as an aspiration, but as an existing, verifiable fact. Jones Soda, for the first time, claimed to have stocked its products in 21% of retail outlets: this noteworthy event is said

---

[7] Plaintiffs are not challenging any forward-looking statements (FACC ¶ 44; Opposition at 15) and do not argue that defendants' promise to complete shelving by Memorial Day was a misrepresentation simply because the deadline was not met. As discussed in Ronconi, 253 F.3d at 433, "[t]he statement, 'the storm is passing and it will be sunny tomorrow,' when it in fact continues to snow the next day, may be bad forecasting, but it is not necessarily a lie. Without more, it does not raise a strong inference of intentional or deliberate reckless falsity or deception."

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -10-

to have occurred by Memorial Day. Plaintiffs allege that Jones Soda had not, in fact, achieved ACV penetration anywhere near 21% by the end of May 2007. This allegation is supported only by Mr. Pirko's conclusion that "Jones Soda never entered into agreements with retailers that achieved a 25% or even as revised later a 21% ACV retail store penetration for Jones Soda canned soda products . . . ." Pirko Decl. at 16. Again, Mr. Pirko's opinion is based solely on the fact that, on May 1, 2008, defendants said that they were "now" investing in people, systems, consumer demand, and product development. No evidence is provided regarding the number or percentage of stores in which Jones Soda's products were actually stocked as of Memorial Day 2007: in fact, Mr. Pirko acknowledges that he has no such evidence. Pirko Decl. at 15. The May 2008 statement is not inconsistent with earlier representations and does not "raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements to investors." In re Read-Rite Corp., 335 F.3d 843, 846 (9th Cir. 2002).

### b. Twenty-Five Percent ACV in July 2007

At the end of the second quarter 2007, defendant van Stolk had to explain to investors why earnings fell 98% from the second quarter of 2006. In addition to higher costs associated with the launch of its canned soda product, van Stolk reported that sales were adversely impacted by "the slower than expected CSD rollout . . . . We have been targeting Memorial Day as the date of achieving 25% ACV for our Jones Soda cans; however, we did not reach our targeting penetration until July. . . ." FACC ¶ 80. According to Jones Soda, the 25% benchmark announced in January had finally been achieved in July. According to plaintiffs,' this statement was not true at the time it was made, and defendants admitted as much in later disclosures. Plaintiffs point to a November 8, 2007, earnings call during which van Stolk stated:

> The goal was to have 25% of ACV or 16 thousand – I'm sorry – 15,625 stores set by Memorial Day to be in line with the summer selling season. Retailers were delayed in the setting of the shelves. By the end of August Jones Soda cans were in 15,700 retailers across the country, or 25% of the 62,500 stores that make up the

| | |
|---|---|
| 1 | ACV. This is an increase of 14,620 stores compared to January 1, 2007. |

One could infer from this later statement that the 25% target was not actually reached until "the end of August," which would make the earlier statement of 25% market penetration in July false. See Read-Rite, 335 F.3d at 846-47. The inference is not particularly strong, however, and the Court must determine whether plaintiffs' allegations, taken as a whole, raise a strong inference that the August 2, 2007, statement was intentionally false, misleading, or made with deliberate recklessness.

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff . . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Tellabs, 127 S. Ct. at 2510. Having thoroughly reviewed plaintiffs' allegations, the Court finds that while it may be "reasonable" to draw the inference that defendants lied about achieving 25% market penetration in July 2007, the inference is weak in the absence of evidence regarding actual market penetration during the relevant period. The more likely explanation, given the syntax and context of the statements, is that Jones Soda experienced only a modest increase in market share between the end of July and the end of August such that the overall percentage of ACV penetration remained constant at around 25% but the number of stores carrying the product rose from 15,625 stores to 15,700 stores. The varying numbers and calculations included in the November 8, 2007, statement is simply too thin a reed on which to base a finding of intentional or deliberately reckless falsehood.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                -12-

### c. Twenty-Five Percent ACV by the End of August 2007

According to plaintiffs, defendants' claim to have achieved 25% ACV penetration by the end of August was in turn proved false by even later disclosures. In an earnings call on March 10, 2008, Stephen Jones, the interim CEO of Jones Soda who replaced van Stolk, said, "We made a major investment in listing fees to expand our points of availability. And by the end of the year, we had an important new asset at Jones – 15,000 new outlets that gave us 25% of the market of canned soda." FACC ¶ 83. The inference of falsity and scienter drawn from these statements is even weaker than that drawn from the pair of disclosures discussed in Section 4(b) above. The March 10, 2008, conference call coincided with Jones Soda's announcement of its earnings for the fourth quarter 2007 and for the entire year of 2007. FACC ¶ 83. A new CEO had taken over the helm, and the supposedly inconsistent statement was made as part of a year-end summary for investors. In this context, the statement "by the end of the year" is less likely a reference to a date certain, such as December 20, 2007, and more likely a general reference informing investors of accomplishments achieved during the reporting period. An holistic assessment of the allegations, including consideration of plausible nonculpable explanations for defendant's conduct and the absence of any evidence regarding the actual distribution of Jones Soda products during the relevant period, does not give rise to a strong inference that defendants lied when van Stolk said Jones Soda had reached 25% ACV penetration by the end of August.

### d. Twenty-Five Percent ACV by the End of 2007

In the First Amended Consolidated Class Action Complaint, plaintiffs allege that Jones Soda never reached 25% market penetration, making Mr. Jones' March 10, 2008, statements false. This allegation is based solely on Mr. Pirko's opinion that it would have been impossible for Jones Soda to attain that level of market penetration because the company did not make the expenditures that such an expansion would require. The May 1, 2008, statement that

Jones Soda is "now" investing in infrastructure does not raise a cogent, compelling, or strong inference that the company was not taking appropriate steps to enter the carbonated soft drink market throughout the class period. Neither the allegations of the complaint nor Mr. Pirko's declaration raise a strong inference of intentional falsehood or deliberate recklessness.

**B. LOSS CAUSATION**

Because plaintiffs have not adequately pled falsity and scienter as to any of the statements identified in the complaint, the Court need not determine the adequacy of their loss causation allegations.

**C. LEAVE TO AMEND**

Federal Rule of Civil Procedure 15(a)(2) directs federal courts to "freely give leave [to amend] when justice so requires." The Court has discretion to deny leave to amend when the record reveals "undue delay, bad faith or dilatory motive on the party of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." Zucco Partners, LLC v. Digimarc Corp., ___ F.3d ___(9th Cir. January 12, 2009) (2009 WL 57081). Because the PSLRA is so technical and demanding, "the drafting of a cognizable complaint can be a matter of trial and error," making it even more important to allow the filing of successive pleadings in this context. Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048 (9th Cir. 2003).

Plaintiffs' request for leave to amend sets forth the governing law, but provides no indication of what additional facts they might plead if given the chance to amend. In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1098 (9th Cir. 2002). The only change proposed in their opposition would shorten the class period to March 10, 2008, but such an alteration would not cure any of the deficiencies identified by the Court. No additional details regarding a proposed amendment were provided at oral argument, making it very difficult to determine whether an

amended pleading would fare any better than the current complaint. The record suggests that plaintiffs do not have the necessary evidence of intentional falsehood: Mr. Pirko has stated that plaintiffs do not have any records showing the actual percentage ACV Jones Soda enjoyed at critical points throughout 2007. The Court is loathe to grant leave to amend where the particulars of the amendment are unknown and the existing record suggests futility. On the other hand, dismissing the complaint with prejudice at this point seems premature because some of the deficiencies identified by the Court may be curable[8] and plaintiffs are only now obtaining the benefit of the Court's analysis of their claims. Plaintiffs will therefore be given thirty days in which to file a motion for leave to amend that is supported by a proposed amended pleading.

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss is GRANTED and the First Amended Consolidated Class Action Complaint is hereby DISMISSED. Plaintiffs may file an adequately supported motion for leave to amend within thirty days of the date of this Order.

Dated this 9th day of February, 2009.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

---

[8] The Court cannot imagine how amendment could save plaintiff's first allegations of falsity related to the January 10, 2007, statements: plaintiffs' theory of liability was based on an unreasonable interpretation of the statements and cannot be cured through further factual averments.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                -15-